[Civ. No. 29816. First Dist.. Div. One. Feb. 16, 1973.]

FIELD RESEARCH CORPORATION et al.,
Plaintiffs and Respondents, v.
WILLIAM P. PATRICK, Defendant and Appellant.

## COUNSEL

Cooper, White & Cooper, Charles W. Kenady, Paul H. Verriere, Jr., and Alan C. Freeland for Defendant and Appellant.

Haizlip, Ring, O'Donnell & Moore and David D. Ring for Plaintiffs and Respondents.

## OPINION

**ELKINGTON, J.**—Plaintiffs Field Research Corporation and Mervin D. Field commenced an action against defendant William P. Patrick for damages for libel. Judgment was thereafter entered, on jury verdicts, in favor of Field Research Corporation for $50,000 compensatory damages and $50,000 punitive damages, and in favor of Mervin D. Field for $100,000 compensatory damages and $100,000 punitive damages. Patrick has appealed from the judgment.

After review of the trial record and consideration of the applicable law we have concluded that the judgment must be affirmed, and for the reasons which we now state.

Field and Field Research Corporation owned and operated a public opinion poll, known as the California Poll. Patrick was a candidate for the Republican nomination for Governor of California, at the June 1966 primary election. On February 15, 1966, the California Poll published a canvassing result indicating that Patrick was favored by but 1 percent of the state's Republican voters.

Thereafter, during the period February 19, through May 2, 1966, Patrick made many remarks about the California Poll, Field Research Corporation and Field. Among them he stated that the February 15, 1966, poll

was corrupt, dishonest, and rigged, that another primary candidate, one Christopher, had bought the poll for $16,000, that he knew the person who paid the money either to Field or the Field Research Corporation, and that he had people who were "willing to testify to the fact that money exchanged hands, $16,000 to be exact." The statements were made to, and widely published by, the several news media throughout California.

These remarks of Patrick became the subject of the instant action against him.

At the trial it was either conceded, or established beyond any reasonable doubt, that the alleged defamatory statements were in fact made by Patrick, that they were defamatory per se, that they were widely published by the news media to which they were made, and that they were in their entirety, untrue. It was further conceded by the parties that Field and Field Research Corporation were "public figures," and that Patrick's questioned remarks were privileged, unless made with actual malice.

The principal issue was the question whether Patrick's otherwise privileged comment was made with *"actual malice."* Here the parties were in agreement that the applicable rule provided that a public figure was precluded from recovering damages for a defamatory remark about his public conduct, in the absence of proof that the statement was made with actual malice—that is, *with knowledge that it was false or with reckless disregard of whether it was false or not.* (See *Rosenbloom* v. *Metromedia* (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811]; *Monitor Patriot Co.* v. *Roy* (1971) 401 U.S. 265 [28 L.Ed.2d 35, 91 S.Ct. 621]; *Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537]; *Beckley Newspapers* v. *Hanks* (1967) 389 U.S. 81 [19 L.Ed.2d 248, 88 S.Ct. 197]; *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412].) On this subject the jury was correctly instructed, the court stating, "the term 'actual malice' means that the defendant either published statements knowing they were false or with reckless disregard of whether they were false or not."

We now proceed to our analysis of the several contentions of Patrick's appeal.

I. His principal assignment of error is stated in this manner: "The trial court erred in instructing the jury that plaintiffs only had to prove actual malice by a preponderance of the evidence, and by refusing to instruct that clear and convincing evidence was the standard."

The trial court instructed the jury that "plaintiffs have the burden of proving actual malice by a preponderance of the evidence." The contention that this was error bears closely on recent developments of the law of libel.

In 1963, the United States Supreme Court in *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 284-286 [11 L.Ed.2d 686, 708-710], imposed upon itself the duty to determine whether evidence upon which a jury found actual malice, had "the *convincing clarity* which the [First Amendment] constitutional standard demands, . . ." (Italics added; pp. 285-286 [11 L.Ed.2d pp. 709-710].)

The next related case of the high court was *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130, where it was contended the defendant had previously waived certain constitutional privileges. Holding otherwise, the court stated: "Where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued [First Amendment] freedom, we are unwilling to find waiver in circumstances which fall short of being clear and compelling." (P. 145 [18 L.Ed.2d p. 1105]; italics added.)

In 1967 the court in *Beckley Newspapers* v. *Hanks, supra,* 389 U.S. 81, reversed a libel judgment, itself finding that the *"convincing clarity"* of proof of actual malice required by *New York Times Co.* v. *Sullivan, supra,* was lacking.

The foregoing decisions seem to have been widely understood as requiring courts, as distinguished from juries, not to allow a libel judgment except upon actual malice established by clear and convincing evidence. (See *Dacey* v. *Florida Bar, Inc.* (5th Cir. 1970) 427 F.2d 1292; *Bon Air Hotel, Inc.* v. *Time, Inc.* (5th Cir. 1970) 426 F.2d 858, 866; *Time, Inc.* v. *McLaney* (5th Cir. 1969) 406 F.2d 565, 572; *United Medical Laboratories* v. *Columbia Broadcasting Sys.* (9th Cir. 1968) 404 F.2d 706, 712-713; *Pauling* v. *Globe-Democrat Publishing Company* (8th Cir. 1966) 362 F.2d 188, 198; *Cerrito* v. *Time, Inc.* (N.D.Cal. 1969) 302 F.Supp. 1071, 1073-1074; *Bennett* v. *Transamerican Press* (S.D.Iowa 1969) 298 F.Supp. 1013; *Pape* v. *Time, Incorporated* (N.D.Ill. 1969) 294 F.Supp. 1087, 1088; but see *Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324, 341, where the *jury* were instructed that actual malice must be established with "convincing clarity.")

It was at this point that the case at bench was, in July 1970, tried.

Thereafter *Monitor Patriot Co.* v. *Roy, supra,* 401 U.S. 265, was decided. It suggested (pp. 237-276 [28 L.Ed.2d pp. 41-44]), at least where

public officials or "public figures" were concerned, that something more than " 'preponderance of the evidence' " jury instructions were required by the First Amendment in defamation cases.

But the latest case of the series, *Rosenbloom* v. *Metromedia, supra,* 403 U.S. 29, leaves no doubt that First Amendment standards require jury instructions that "actual malice" be established by *"clear and convincing evidence."* A Pennsylvania statute had stated, in effect, that malice attended the publication of defamatory material, if done "unreasonably and without ordinary care" to determine its truth. Reversing a plaintiff's jury verdict and judgment the Supreme Court stated: "[W]e ordinarily decide civil litigation by the preponderance of the evidence. Indeed, the judge instructed the jury to decide the present case by that standard. In the normal civil suit where this standard is employed, 'we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor.' [Citations.] In libel cases, however, we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement—the three-quarter-million-dollar jury verdict in this case could rest on such an error—but the possibility of such error, even beyond the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate. These dangers for freedom of speech and press led us to reject the reasonable-man standard of liability as 'simply inconsistent' with our national commitment under the First Amendment when sought to be applied to the conduct of a political campaign. [Citation.] The same considerations lead us to reject that standard here." (Pp. 50-51 [29 L.Ed.2d pp. 315-316].)

"We thus hold that a libel action, as here, by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." (P. 52 [29 L.Ed.2d pp. 316-317].)

*Rosenbloom* v. *Metromedia* must be read as a constitutional command that juries in libel actions be instructed that proof of "actual malice" shall be by "clear and convincing evidence." The rule comports with reason, for who but the trier of fact should, at least initially, apply the rules upon which liability for defamation is predicated.

It follows that Patrick's instant contention of error is valid.

There remains for us, however, the question whether such error was harmless.

We advert now to the uncontradicted evidence of the record to determine whether it may be said, as a matter of law, that actual malice—proof that the defamatory matter was published by Patrick with knowledge that it was false or with reckless disregard of whether or not it was false—was established.

Patrick testified that his *sole* source of information concerning the February 15, 1966, California Poll was one Polakoff, a worker in his political campaign. Polakoff told him, on or before February 17, that he had "it from a very close friend" named Broome, that Broome's "girl friend working in the Field office" had stated that "the Christopher organization paid $16,000 on the poll, to have that poll make Christopher look good at this time." Patrick asked Polakoff if "he could get that information," and Polakoff replied, "I'm sure I can." Only once again did Patrick discuss the subject with Polakoff; it was three days or a week or two weeks later, but not later than March 3. At that time Polakoff said he was having difficulty getting Broome, who was "holding out," to deliver the information. Polakoff himself, Patrick testified, had no information "that was useful to us"; he had said he was having some difficulty "but he thought he could get it." Patrick never learned anything further about the poll from Polakoff, or from anyone. He, himself, knew Broome, but made no effort to get in touch with him. And he never did, or even tried to, find out the name of Broome's girl friend.

As pointed out, Patrick's second and final talk with Polakoff about the matter was no later than March 3, 1966. At that time, by Patrick's own appraisal, Polakoff had no information "that was useful to" establish the truth of Patrick's charges about the poll. But, nevertheless, over the next two months Patrick continued, repetitiously, to assure the public by means of newspapers, radio and television, that the poll was bought by Christopher for $16,000, that he would produce actual evidence of this at the trial, that he had proof that the poll was rigged, that he knew the identity of the person who paid the money, and that he had "people who are willing to testify to the fact that money exchanged hands, $16,000 to be exact."

It has consistently been held that where the facts and circumstances under which a defamatory publication is made are not disputed, the question of privilege, i.e., the existence of actual malice is one of law. In such a case there is no factual issue for the jury's determination. (*Dauphiny* v. *Buhne*, 153 Cal. 757, 764 [96 P. 880]; *Carpenter* v. *Ashley*, 148 Cal. 422, 425 [83 P. 444]; *Swaffield* v. *Universal Ecsco Corp.*, 271 Cal.App.2d 147, 163 [76 Cal.Rptr. 680]; *Russell* v. *Geis*, 251 Cal.App.2d 560, 567 [59

Cal.Rptr. 569]; *Kramer* v. *Ferguson*, 230 Cal.App.2d 237, 244 [41 Cal. Rptr. 61]; *Freeman* v. *Mills*, 97 Cal.App.2d 161, 166 [217 P.2d 687]; *Jones* v. *Express Pub. Co.*, 87 Cal.App. 246, 256 [262 P. 78]; *Adams* v. *Cameron*, 27 Cal.App. 625, 638 [150 P. 1005, 151 P. 286].)

By uncontradicted evidence it was demonstrated at the trial that many of Patrick's published remarks, such as knowing who paid the money and that he had witnesses who were willing to testify that the money changed hands, were known by him to be false. And Patrick's own testimony established uncontrovertibly that he believed that he had received from Polakoff, his only informant, no information "that was useful to us" in support of the continued charges of the California Poll's corruption. It necessarily follows that, *believing* himself without useful information concerning these defamatory statements, Patrick entertained doubts of their truthfulness. ██ And as said in *St. Amant* v. *Thompson*, 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323]: "Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." ██ This and the other uncontradicted evidence establishes, at least, and as a matter of law, a reckless disregard by Patrick of the truth or falsity of his statements and thus, actual malice. This being the posture of the case when it was submitted to the jury, the trial court should have instructed that actual malice had been established.

It thus becomes apparent that the trial court's "preponderance of the evidence" instructions constituted harmless error under California Constitution, article VI, section 13, and under the federal constitutional standards of *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

II. Another contention of Patrick is that: "The evidence presented by plaintiffs at trial fails to show with convincing clarity that the defendant published his statements with actual malice."

The argument here is that this court, from its own examination of the record, must find the evidence of actual malice not to be clear and convincing. We have read the record and we are unable to make such a finding.

III. Next it is urged that "The trial court's refusal to allow the jury to consider the report of Polakoff on the issue of actual malice was error requiring reversal."

During the course of Patrick's testimony concerning his information from

Polakoff, which Patrick had described as a rumor, plaintiffs requested that their "instruction 35" be read. Without objection from Patrick the court read the following instruction: "Now, evidence of rumor is not admissible in this case to prove the truth of what was rumored, or to prove absence of malice on the part of Mr. Patrick in repeating the rumor. This evidence has not been received for that purpose and can have no bearing on either the issue of truth or malice and you are to disregard this evidence for that purpose. It has been admitted in this case solely for the purpose of explaining Mr. Patrick's other testimony."

` At the close of the trial, among others, these instructions were given: "A false statement is no less defamatory because it is the repetition of rumor or gossip. If you conclude that what Polakoff told the defendant Patrick was a rumor, then that evidence shall have no bearing on either the issue of truth or malice, and you are to disregard this evidence for that purpose. But if you find that the statement of Polakoff to defendant Patrick was not a rumor, then the evidence as to what Polakoff may have told the defendant with regard to the matter involved in the defamatory statements bears on the question of malice and may be considered by you on that question."

Patrick now urges that such instructions erroneously prevented Polakoff's information from being considered by the jury on the issue of actual malice.

We need not consider this contention for as we have pointed out, Polakoff's report to Patrick, whether considered as rumor or not so considered, with other uncontradicted evidence of the case as a matter of law established actual malice, and thus there was no jury question on that issue.

IV. ▮ It is contended that "In a First Amendment case, plaintiff has the burden of proving falsity."

The record indicates that during the trial, for some reason Patrick moved "to withdraw the affirmative defense of truth" of his defamatory statements. The motion was granted. And the evidence produced by plaintiffs that the statements were false may properly be described as overwhelming; there was no contrary evidence.

Here again it must be said as a matter of law that Patrick's statements were false, and that the jury should have been so advised. Since there was no jury question on this point we need not resolve Patrick's contention that, contrary to the trial court's jury instructions, recent cases place the

burden of proving falsity on the plaintiff of a libel action. The error, if any, was not prejudicial and was harmless under state and federal constitutional standards.

V. ▮ Another assignment of error follows: "The trial court erred in refusing to order plaintiffs to produce the [1,042] completed questionnaires used by plaintiffs' interviewers on which the poll was based."

Almost two years before the trial, in response to interrogatories, plaintiffs advised Patrick that the completed questionnaires were in existence. No demand for their production or inspection was made until midway through the trial when Patrick asked for a "court order that they be produced."

We note no compliance whatever with Code of Civil Procedure section 2031 providing for production and inspection of documents on motion, upon 10 days' notice to all parties. Nor was any excuse for such noncompliance offered. And the trial court stated, "I don't think there is any basis established yet for me ordering him to do any such thing. So if there is at a future point in this trial, the court will then entertain your request or motion again." No further request for production of the papers was ever made.

We observe no abuse of discretion in the trial court's provisional order denying the motion to produce.

VI. Patrick's final contention is that the trial court failed to instruct the jury on damages in the manner required by *Rosenbloom* v. *Metromedia, supra,* 403 U.S. 29.

He concedes that the jury as to both compensatory and punitive damages, were correctly instructed in accordance with California law as it existed, or at least appeared to exist, at the time of the trial. He argues that *Rosenbloom* v. *Metromedia,* decided almost a year later, "changed the law and made it clear for the first time that damages in defamation actions are also circumscribed by the Constitution." Operating retroactively, he insists, this change requires reversal of the judgment under appeal.

Part of the argument relates to the need for clear and convincing evidence of actual malice in support of a damage award in a libel action. Here we are in agreement but as pointed out, clear and convincing evidence of such malice does appear in this case. The balance of the argument is drawn in part from the remarks of dissenting justices of *Rosenbloom* v. *Metromedia.* We are assured that a justice who did not participate in the decision "would

undoubtedly agree with this," as would a participating justice (who did not in fact express such agreement). Thus, we are told, ". . . it is entirely possible, even likely, that a majority of the Supreme Court will hold that *any* award of punitive damages in a defamation case is unconstitutional. At the very least, however, a majority of the court agrees that any such award must meet stringent guidelines or it violates the First Amendment."

We are unpersuaded. With the exception we have discussed, our close study of *Rosenbloom* v. *Metromedia* fails to disclose the change in the law as suggested by Patrick.

But for the argued "change of law" brought about by *Rosenbloom* v. *Metromedia,* no contention is made that the damage awards were excessive. And we note that Patrick's net worth was an issue at the trial, the evidence showing his admissions in 1966 that he was worth $7,000,000, and in December 1968, "Oh, conservatively $25 million."

The judgment is affirmed.

Molinari, P. J., and Weinberger, J.,* concurred.

A petition for a rehearing was denied March 16, 1973, and appellant's petition for a hearing by the Supreme Court was denied April 12, 1973.

---

*Assigned by the Chairman of the Judicial Council.