[Civ. No. 42805. Second Dist., Div. Four. June 18, 1975.]

GANTRY CONSTRUCTION COMPANY, INC.,
Cross-complainant and Respondent, v.
AMERICAN PIPE AND CONSTRUCTION COMPANY,
Cross-defendant and Appellant.

## COUNSEL

Beardsley, Hufstedler & Kemble, Seth M. Hufstedler, John Sobieski and Peter O. Israel for Cross-defendant and Appellant.

Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Caras & Evangelatos, George Caras and Herman F. Selvin for Cross-complainant and Respondent.

## OPINION

**KINGSLEY, Acting P. J.**—In September 1966, appellant, American Pipe and Construction Co. (Ameron)[1] contracted to sell a substantial quantity of pipe[2] to respondent, Gantry Construction Company (Gantry), for use in constructing a project for the City of Los Angeles. The contract called for delivery of the pipe in installments, for invoicing the delivered pipe, and for payment by Gantry for delivered pipe by the 25th of each month after invoice. Pursuant to the provisions of its contract with the city, Gantry procured a performance bond from Pacific Indemnity (Pacific).

It is clear from the whole record that Gantry was underfinanced and that it depended on progress payments from one job to meet unpaid bills on a previous job. Gantry admitted at the trial that it never intended to meet the contract terms for payment, but that it intended from the first to wait from 30 to 60 days before making a required contractual payment. Pursuant to its business policy (and economic need) Gantry for several months used the progress payments made to it by the city on the contract herein involved to meet obligations arising out of an earlier contract with the city. As a result, although billings by Ameron started at the end of November 1966, no payments were made by Gantry until March 1967,

---

[1]Since the institution of this action, the corporate name of American Pipe and Construction Company has been changed to Ameron. As do the parties in their briefs, we use the new (and shorter) name in referring to appellant.

[2]The total contract price was in excess of $850,000.

when it paid $26,934.26, against a total billing as of the end of February of $139,532.65.

Testimony on behalf of Ameron was to the effect that efforts to secure and expedite payments were begun by Ameron in January 1967, continuing without success until April.[3] On April 13, Gantry paid Ameron an additional $25,661.04.

On or about April 14, 1967, an official of Ameron called an official of Pacific, telling him that Gantry was seriously in default and soliciting Pacific's aid in expediting payments. The 'phone call was confirmed by a letter, in which the amount of Gantry's default was stated as being $247,634.48. On April 17, 1967, Ameron and Gantry negotiated a new payment schedule, calling for Gantry to pay Ameron about 75 percent of each progress payment received by Gantry from the city. On April 18, 1967, Ameron advised Pacific of the new arrangement.

Alerted by the calls and letter from Ameron, Pacific instituted a series of inquiries into the financial condition of Gantry. As a result of those inquiries, it (and other bonding companies) refused to bond Gantry on future jobs resulting, as Gantry claims, in its failure, with loss of future profits and the value of its established business.

On these facts, Gantry sued Ameron for slander and for interference with business relations.[4] After a trial by jury, Gantry recovered judgment in the amount of $3,500,000; Ameron has appealed; we reverse for the errors hereinafter discussed in the instructions dealing with the defense of qualified privilege. Since the case must be retried, we comment on certain deficiencies in other instructions for the assistance of counsel and the trial court on such retrial.

I

Relying on the fundamental proposition that "[t]ruth of the statements made is a complete defense against *civil liability* for defama-

---

[3]Gantry denied that many of the claimed collection efforts had been made. However, for the purposes of this opinion, dealing as it does with the correctness of instructions, we set forth evidence on the part of appellant, since it is that evidence which appellant claims entitled it to instructions based on that evidence.

[4]The suit began as one by Ameron against Gantry and Pacific to recover $500,000 unpaid by Gantry. Gantry cross-complained against Ameron. Pacific paid Ameron its demand and the case proceeded on the cross-complaint and answer thereto. As the parties do in their briefs, we sometimes refer to cross-complainant Gantry as "plaintiff" and cross-defendant Ameron as "defendant."

tion, regardless of bad faith or malicious purpose" (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 292, p. 2564), defendant contends that its statements to Pacific were true. In support of that contention, it argues that, although admittedly the contract between Ameron and Gantry did not contain an acceleration clause, it had a right to accelerate under subdivision (1) of section 2709 of the California Commercial Code, the pertinent portions of which read as follows: "(1) When the buyer fails to pay the price as it comes due the seller may recover, together with any incidental damages under the next section, the price [¶] (a) Of goods accepted. . . ." If that contention is valid, the statement that Gantry was in default over $247,000 was true; if it is not, the amount in default on April 14, was only about $87,000.

On this issue, the trial court instructed the jury as follows: "Where the agreement between two parties does not contain any provision giving the seller the right upon the buyer's default to declare immediately due the unpaid balance of the purchase price, the seller has no right to declare immediately due the unpaid balance. The contract between plaintiff and defendant has no provision giving the seller the right upon the purchaser's default to declare immediately due the unpaid balance."

(1) Unless the Commercial Code changed the California law on acceleration, the trial court's instruction was correct. We conclude that the Commercial Code did effect a change in the precode law. The comments of the draftsmen of the Uniform Commercial Code, as to this provision, say: "Neither the passing of title to the goods nor the appointment of a day certain for payment is now material in a price action." Plaintiff argues that the California comments do not contain any reference to the "day certain for payment" concept. That comment reads: "Subdivision (1) liberalizes the remedy formerly given to the seller. Under former Civil Code section 1783(1) the seller could maintain an action for the price *only if* title *had passed to the buyer* and the buyer had wrongfully refused or neglected to pay for the goods. Under subdivision (1) the passage of title is immaterial to a seller's right to bring an action for the price." (Italics in original.)

We agree that acceptance of goods without payment does, under the Commercial Code, allow the seller to sue at once not only for past due payments but for the price of all goods then delivered and accepted. (Cal. U. Com. Code, § 2106, subd. (1).) The comment was before the Legislature when the Code was adopted; it adopted, without change, the unambiguous language of the uniform code, i.e.: that mere acceptance

controls the amount of recovery in a suit for the price. We follow the plain meaning of the statute.

While we conclude that the instruction as given was erroneous, we do not agree with appellant that it was entitled to an instruction that, as a matter of law, the defense of truth had been proven. Ameron had not told Gantry that it regarded the entire $247,634 as accelerated and then due. It was for the jury to decide whether the unexpressed intent, to which Ameron's witness testified, actually existed or whether the figure used in the Ameron communication was based on some theory other than that of the Commercial Code section. At a retrial, an instruction on truth as a defense should be given which leaves that factual issue to the jury.

(2) ■ Alternatively, Ameron contends that, under the first sentence of subdivision (3) of section 2612 of the California Commercial Code, it was entitled to treat the entire contract as breached and sue for damages. The language relied on reads as follows: "Whenever noncomformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole." That language, together with other language to which we advert later, was included in a long instruction given on the trial court's own motion. However, we can find in the instructions as given none that advised the jury regarding the meaning of "substantially impairs the value of the whole contract." Absent such amplification, we cannot say that the jury's attention was directed to the question of whether an $87,000 or a $247,634 default was of that character. In addition, as with the argument based on section 2709, there was a jury question as to whether Ameron actually had elected, at the time of the phone call to Pacific, to declare a total breach. On any retrial, the instruction on this subject should cover both of these factors.

(3) ■ Immediately following the portion of the instruction above referred to, the trial court added the following language (based in part on the second sentence of subdivision (3) of section 2612): "However, if the seller has accepted late payments, the seller reinstates the contract unless it notifies the buyer that the contract has been cancelled. Cancellation of the contract occurs when either party puts an end to the contract for a breach of the contract by the other party." The instruction, as given, however omits an important part of that sentence. The statutory language is: "But the aggrieved party reinstates the contract if he accepts a nonconforming installment without *seasonably* notifying of cancella-

tion. . . ." (Italics added.) As the comment of the draftsmen on that language makes clear,[5] Ameron had a seasonable time, after the April 13th payment, within which to decide whether to regard the breach as substantially affecting the value of its entire contract and to notify Gantry of that decision. On this record, in light of Ameron's conduct in negotiating a revised payment schedule and the terms of its communication to Pacific, there was a jury question both as to Ameron's intent and as to the reasonableness of communicating to Pacific without first communicating to Gantry.[6] The instructions as given, not only misstated the statute but left the jury without guidance as to the application of the doctrine of waiver.

(4) ■ The trial court instructed the jury as follows:

"Defendant has pleaded the defense of truth as to plaintiff's cause of action for slander. If this defense has been established, it is a complete defense and bars plaintiff's claim on its cause of action for slander. Defendant has the burden of proving truth by a preponderance of the evidence as defined by the court. To establish this defense, defendant must prove the truth of all important aspects in the statement. However, defendant is not required to prove the truth of every word of the statement or to prove its literal truth.

"If defendant proves that the substance, the gist or the sting of the charge is true, it is sufficient to establish the defense of truth."

The instruction, as given, was correct as far as it went.[7] However, it gave the jury no aid in determining the meaning of the term "all

---

[5]"Under the requirement of seasonable notification of cancellation under subsection (3) a buyer who accepts a non-conforming installment which substantially impairs the value of the entire contract should properly be permitted to withhold his decision as to whether or not to cancel pending a response from the seller as to his claim for cure or adjustment. Similarly, the seller may withhold a delivery pending payment for prior ones, at the same time delaying his decision as to cancellation. A reasonable time for notifying of cancellation, judged by commercial standards under the section of good faith, extends of course to include the time covered by any reasonable negotiation in good faith. However, during this period the defaulting party is entitled, on request, to know whether the contract is still in effect, before he can be required to perform further."

[6]Bearing in the other direction, is the fact that the April 13th payment had been made in the face of Ameron's notice to Gantry that that payment should be $100,000 in amount.

[7] *Emde* v. *San Joaquin County etc. Council*, 23 Cal.2d 146, 160 [143 P.2d 20, 150 A.L.R. 916]; *Jeffers* v. *Screen Extras Guild, Inc.* (1958) 162 Cal.App.2d 717, 728 [328 P.2d 1030]; 4 Witkin, Summary of California Law (8th ed. 1974) Torts, section 292, page 2564.

important aspects of the statement," or of the term "gist or sting." On the record before us, some such help was required. The testimony from the officials of Pacific, not disputed or contradicted, was as follows:

"Q. Did you interpret that call to mean that there might be a financial problem with Gantry Construction Company?

"A. Certainly there were indications that there was a possibility of it, but we didn't accept it completely at its face value. Normally I don't receive such calls unless there is some truth in it, but there possibly could have been some reason why it wasn't paid; so I'm—well, shall I continue as to what I did?

"Q. Yes, please do. Then what did you do?

"A. So, as a result, I called the agent, the Cole Insurance Agency, to contact in turn Gantry to determine whether it was true or whether it was untrue, to either confirm or deny the past due indebtedness.

"Q. All right. I am sorry. Were you continuing?

"A. That was all. And if so, why, if there were any past due indebtedness."

and, again;

"Q. You interpreted Mr. Cass' conversation to mean that the pay record of Gantry was bad with American Pipe?

"A. Yes, I did.

"Q. But Mr. Cass did not tell you exactly how many days they were delinquent? I mean Gantry was delinquent.

"A. As I recall, he told me how much merchandise they had shipped and how much had been paid."

From that testimony, the jury, properly instructed, might have concluded that the "important aspect," the "gist or sting" of Ameron's statement lay in the admittedly truthful statement that Gantry was in default, had been so for some months, and in more than a minor amount. In an analagous situation, the Missouri Court of Appeals had

before it a publication stating truthfully that the plaintiff had been arrested for suspicion of burglary and for receiving stolen goods. The article gave the value of articles found in plaintiff's possession as amounting to "thousands of dollars," whereas their actual value was only $500. Concerning the defense of the truth of the article, the court said: "As to the value of the jewelry, preliminary estimates of value by persons who are not expert are frequently inaccurate and apparently were inaccurate in this instance. But the plaintiff testified the items had a value of five hundred dollars, which, although much less than the amount reported, is nevertheless a substantial sum. As a matter of fact, in an arrest for burglary it would make no great difference what value the items bore. The sting of the article is the arrest of plaintiff suspected of burglary. In the case of McCracken v. Evening News Association, 3 Mich.App. 32, 141 N.W.2d 694, a warrant was issued specifying fraud amounting to approximately $50,000. The newspaper article reported the amount of $100,000. On appeal the judgment allowing recovery in the lower court was reversed and remanded for entry of judgment for the defendant. The appeals court found this account of the larger amount was an inaccuracy which did not alter the complexion of the essential facts. It would have no different effect on the reader's mind than that produced by the literal truth. There was no proof that such a variance would cause damage to plaintiff. We have the same opinion on the effect of the variance between the testimony of plaintiff as to value and the news report in the case before us." (*Turnbull* v. *Herald Company* (Mo.App. 1970) 459 S.W.2d 516, 519). That language is applicable here. But, unaided by any definition of the material terms, a lay jury may well have concluded that the "important aspect," the "gist or sting" lay in the $160,000 difference between the $87,000 amount Gantry admits it owed and the $247,000 stated by Ameron.

## II

Ameron contends that, assuming that it did not maintain its burden of proving truth, it was entitled to rely on the doctrine of qualified privilege and that the trial court's instructions took that defense away.

Subdivision 3 of section 47 of the Civil Code reads, in pertinent part, as follows: "A privileged publication . . . is one made—3 In a communication, without malice, to a person interested therein, (1) by one who is also interested. . . ." The trial court instructed the jury that

Ameron had the burden of proving both that the statements were privileged and that they were made without malice.[8]

(1) We conclude that the trial court erred in leaving to the jury the issue of whether the communications between Ameron and Pacific were prima facie within the statutory definition of qualified privilege. ▮ A communication between interested parties is within the statute, even though the statement is false and defamatory per se. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 301, p. 2572.)[9] ▮ On this record there can be no doubt that both Ameron and Pacific were interested in Gantry's defaults. Ameron's interest is obvious; Pacific, as Gantry's bondsman, was equally interested, since it was required to pay Ameron if Gantry did not. Warning as to defaults, triggering, as it did in this case, inquiries as to the risk of continued or future defaults by Gantry was, on its face, a communication that Pacific was interested in receiving. The testimony of the officials of Pacific, not disputed or contradicted, makes clear the reality and the depth of Pacific's interest. ▮ Where the issue of mutual interest appears without conflict, a defendant in an action for defamation is entitled to an instruction that, as a matter of law, the statement was qualifiedly privileged. (*Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 417 [46 Cal.Rptr. 135]; *Kramer* v. *Ferguson* (1964) 230 Cal.App.2d 237, 245 [41 Cal.Rptr. 61].) As the court said in the *Kramer* case: "The real vice of this instruction, as well as the charge as a whole, is that it left for the jury to determine whether the privilege accorded by subdivision 3 of section 47 did or did not attach to the communications in question. [¶] The court should have instructed the jury that the law gives to one who publishes this type of communication a privilege to do so and that the only issue for it to determine in this respect was whether the communication was made with malice, in which event the privilege was lost. On the contrary, the instructions left it for the jury to determine whether the qualified privilege ever did or did not exist."

---

[8]"The defendant has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues as to plaintiff's cause of action for slander:

"1. That the statements were privileged.

"2. That the statements were made without malice.

"3. That the statements were true."

"If you determine that defendant acted with malice in making the statements, it has no defense of privilege. The defendant has the burden of proving the absence of malice."

[9]In addition to the other errors in the instruction quoted in footnote 8, it is to be noted that the instruction erroneously required Ameron to prove *both* truth and privilege, and, as to privilege, see our later comments.

(2) ▆▆ As we have noted above, the trial court instructed the jury that the burden was on Ameron to prove the absence of malice. In answer to that contention Gantry refers us to numerous cases, all of which support the instruction as given. However, as Ameron's brief in this court points out, if the complaint alleges facts showing that the statement was, prima facie, entitled to the qualified privilege, then plaintiff must allege and prove the presence of malice. (*Everett* v. *California Teachers Assn.* (1962) 208 Cal.App.2d 291, 295 [25 Cal.Rptr. 120]; *McCunn* v. *California Teachers Assn.* (1970) 3 Cal.App.3d 956, 962 [83 Cal.Rptr. 846]; *Warfield* v. *McGraw-Hill, Inc.* (1973) 32 Cal.App.3d 1041, 1047 [108 Cal.Rptr. 652].)[10] It is the latter rule which applies here. In its complaint, Gantry alleged the status of Ameron and of Pacific. As we have held above, the facts thus pleaded showed a prima facie case of qualified privilege as a matter of law. Recognizing that fact, Gantry also pleaded, in great detail, that the statements were made with malice. The burden of proof on the issue of malice was on Gantry and not on Ameron.

## III

▆▆ As a second cause of action, Gantry pleaded that Ameron had been guilty of the tort of interference with existing and prospective business relations. Regarding that matter, the trial court instructed the jury (modifying Ameron's requested instructions) as follows:

"The Plaintiff, in its second cause of action, claims that Defendant interfered with its contractual expectancies. This is defined to mean that one who, without a privilege to do so, intentionally induces or otherwise purposely causes a third person not to enter into or to continue a business relation with another, is liable to the other for the harm caused thereby. This means that if you find that AMERON, INC., without a privilege to do so, intentionally induced, or otherwise purposely caused Pacific Indemnity not to enter into or continue business relations with Gantry, then AMERON, INC. is liable to GANTRY for the harm proximately caused thereby."

---

[10]"Ordinarily privilege must be specially pleaded by the defendant, and the burden of proving it is on him. [Citations.] But where the complaint shows that the communication or publication is one within one of the classes qualifiedly privileged, it is necessary for the plaintiff to go further and plead and prove that the privilege is not available as a defense in the particular case, e.g., because of malice. [Citations.]" (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 302, p. 2573.)

"In order for Plaintiff to prove its cause of action for interference with a contractual relationship, it must prove by a preponderance of the evidence that, by its action, Defendant intentionally interfered with the contractual relationship alleged."

As Ameron points out, the instructions, as given, permitted the jury to find against it if its action in calling Pacific was intentional (which it obviously was) rather than that such action was intended to interfere with the relationship between Gantry and its bonding company. It is the latter intent that is material. (*Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33, 37 [112 P.2d 631].)

Since the judgment must be reversed for the reasons above-stated, it is unnecessary to discuss other contentions of Ameron. They involve matters that may well not arise on a retrial.

The judgment is reversed.

Dunn, J., and Jefferson, J.,* concurred.

A petition for a rehearing was denied July 10, 1975, and the following opinion was then rendered:

**THE COURT.**—As the opinion heretofore filed states, we reverse the judgment on the grounds set forth under Rubric II of the opinion, dealing with the defense of qualified privilege. The discussion of other instructions was made, pursuant to the intent of section 53 of the Code of Civil Procedure, for the guidance of the trial court and counsel on any retrial. As such, we did not, and need not, determine whether any of the other deficiencies pointed out could, by reason of the trial court proceedings, have been independent grounds for reversal; our reversal was not based on any of the matters discussed under Rubrics I and III of the opinion.

Respondent's petition for a hearing by the Supreme Court was denied August 13, 1975.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.