[Civ. No. 45057. First Dist., Div. One. Dec. 29, 1980.]

INSTITUTE OF ATHLETIC MOTIVATION,
Plaintiff and Appellant, v.
UNIVERSITY OF ILLINOIS et al., Defendants and Respondents.

**COUNSEL**

Beauzay, Hammer, Ezgar, Bledsoe & Rucka, W. Robert Morgan and Morgan, Zazueta, Morgan, Towery, Morgan & Spector for Plaintiff and Appellant.

Ropers, Majeski, Kohn, Bentley & Wagner, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Michael J. Brady and Mark G. Bonino for Defendants and Respondents.

**OPINION**

**GRODIN, J.**—In this action for defamation the jury returned a general verdict for defendants and plaintiff appeals, asserting instructional error. The principal issue presented concerns the scope of privilege for communication to interested persons under Civil Code section 47, subdivision 3. Finding no error warranting reversal, we affirm.

Plaintiff Institute of Athletic Motivation is a corporation founded in the late 1960's by two clinical psychologists, Bruce Ogilvie and Thomas Tutko, to develop and market what they termed an "Athletic Motivation Inventory" (AMI). The AMI, in the form of a questionnaire, is administered to coaches and athletes and purports to identify certain personality traits predictive of athletic success. It was the first "sports-specific" psychological test to be developed, and has been widely used by high schools, colleges, and private and professional athletic organizations.

Defendant Rainer Martens is a professor of physical education at the University of Illinois with a Ph.D. in sports psychology. He has himself published extensively on the subject of sports psychology and scientific research methodology. On January 10, 1975, Professor Martens wrote a four-page letter critical of the AMI which he sent to numerous professional athletic organizations and to several sports magazines. The letter asserted, among other things, that while Ogilvie and Tutko "frequently claimed to have supportive evidence" for the AMI, "surprisingly they have been unwilling or unable to provide any evidence that AMI . . . is reliable or valid." To offer on a commercial basis a psychological test that does not have "extensive public documentation of its reliability and validity" is, the letter claimed, an "unethical practice" according to standards of the American Psychological Association; and "[t]o infer a cause and effect relationship on the basis of correlational evidence" was "an error only the novice graduate student would make." Use of the AMI by coaches was asserted to be a matter of concern "because incorrect diagnoses and prognoses may be detrimental to the athlete and coach," and "because Ogilvie and Tutko have failed to adhere to scientific protocol and ethical behavior for psychologists," leading coaches and athletes to be "deceived under the auspices [*sic*] that scientific evidence provides the basis for their diagnoses and prognoses." The letter called upon "the various sport organizations who directly work with coaches and athletes [to] initiate action to expose the AMI" by "inform[ing] their constituents of the potential harm that can result from

unproven psychological testing. If nothing else, it is un unjustified expense."

One of the organizational recipients of the letter, the National Basketball Coaches Association, republished the letter in its periodical, "Basketball Bulletin," which is sent to basketball coaches throughout the United States. So far as appears from the record, none of the other recipients republished or made public use of its contents.

Plaintiff sued both Martens and the University of Illinois (the latter on a theory of respondeat superior), claiming that the letter contained false and defamatory statements. At trial, plaintiff sought to establish that studies confirming the reliability and validity of the AMI did in fact exist, that Martens knew or should have known of their existence at the time he sent the letter, and that Martens ignored evidence of their existence which plaintiff sent him in an effort to obtain retraction. Plaintiff also sought to convince the jury that Martens acted with ulterior or selfish motives in sending the letter, and in that regard introduced evidence to show that in the same month he sent the letter he published a book on the subject of sports psychology, and two years later published his own, competing, sports inventory test. Martens, on the other hand, claimed that he reached his conclusion as to the unreliability of the AMI only after extensive research, consultation with other experts, and unproductive requests for information from persons connected with plaintiff; and that his sole motivation in writing the letter was to inform "interested" parties about the unreliability of the AMI and its potential for abuse.

■ ■■■ At the conclusion of trial, the court ruled that the letter was defamatory as a matter of law "in that it has a tendency to affect the integrity and business reputation of the plaintiff,"[1] and that

---

[1]If Martens' letter were viewed as containing only an expression of his opinion concerning the statistical accuracy or sufficiency of particular studies proffered in support of the AMI, then of course the communication would be immune from liability on the principle that "[u]nder the First Amendment there is no such thing as a false idea." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997]; *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425].) Respondents do not contend for that proposition, however, and the letter's assertion that Ogilvie and Tutko were unwilling or unable to provide "any evidence" of reliability or validity could reasonably be understood, and was arguably intended, as meaning not simply that particular studies were inadequate but that there were no studies at all. Whether an allegedly defamatory statement constitutes fact or opinion is a question of law, to be determined in light of the nature and content of the communication taken as a whole. (*Gregory* v. *McDonnell Douglas Corp., supra*, at p. 601.)

the University of Illinois was responsible for its publication through ratification. Accordingly, the case went to the jury on the defenses, asserted by both defendants, of truth and privilege.

On the issue of privilege, defendants submitted various instructions based upon Civil Code section 47, subdivision 3 and the case law under that section.[2] Initially, plaintiff proposed a supplementary instruction to the effect that "[a] common interest in the subject matter must be demonstrated between the person communicating and the person reading the communication before this privilege is established." Later, however, plaintiff withdrew all requests for instructions relating to privilege, contending that the defense of privilege "does not exist in a situation like this." The trial court nevertheless gave the instructions on privilege proposed by defendants, with certain modifications, and it is these instructions which constitute the principal focus of plaintiff's appellate attack.[3] Jury instructions regarding the existence of a qualified privilege, plaintiff argues, should have been refused as a matter of law.

---

[2]Defendants do not contend that plaintiff is a "public figure" within the meaning of federal constitutional doctrine (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed. 686, 84 S.Ct. 710, 95 A.L.R.2D 1412]; *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]; *Gertz* v. *Robert Welch, Inc., supra*, 418 U.S. 323), and the jury was not instructed under that doctrine. In *Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14], the California Supreme Court held that a corporation does not become a public figure subject to the *New York Times* rule simply because it sells goods to the public and advertises the sale: "While availability of goods for sale and their quality are matters of public interest, this is not the test." (*Id.*, at p. 769.) The court expressed no view, however, as to whether the statements in that case were privileged under California law. (*Id.*, at p. 770, fn. 1.)

Recent case law suggests that even private individuals suing for defamation may be precluded from recovery as a matter of constitutional doctrine, and apart from any privilege, unless it can be shown that the defendant was negligent in failing to ascertain the falsity or defamatory character of the publication. *Gertz* declared that states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehoods injurious to a private individual "so long as they do not impose liability without fault" (418 U.S. at p. 347 [41 L.Ed.2d at p. 809]), and while *Gertz* involved media defendants some courts have found the principle applicable to nonmedia defendants as well. (E.g., *Jacron Sales Corp., Inc.* v. *Sindorf* (1976) 276 Md. 580 [350 A.2d 688, 697]; *Sewell* v. *Brookbank* (1978) 119 Ariz. 422 [581 P.2d 267].) This is also the Restatement view. (Rest.2d Torts, § 580B, com. e. But cf. *Wheeler* v. *Green* (1979) 286 Ore. 99 [593 P.2d 777]; *Calero* v. *Del Chemical Corp.* (1975) 68 Wis.2d 487 [228 N.W.2d 737]; Shiffrin, *Defamatory Non-Media Speech and First Amendment Methodology* (1978) 25 UCLA L.Rev. 915.) Defendants sought no instructions based on *Gertz*, however, and no such instructions were given. Accordingly, we are not called upon to consider whether or to what extent these constitutional principles may require modification of California defamation law.

[3]The jury was instructed in the language of section 47, subdivision 3, and in addition was instructed as follows: "If it is determined that Dr. Rainer Martens was acting in

## DISCUSSION

Civil Code section 47, subdivision 3 provides that a publication or broadcast is privileged if made: "In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

The code affords no definition of the term "interested" and the case law reflects an eclectic approach to its interpretation. One of the earliest cases is *Snively* v. *Record Publishing Co.* (1921) 185 Cal. 565 [198 P. 1], involving the publication in a newspaper of a cartoon which imputed dishonesty to the Los Angeles Police Chief. The court held that the citizens of Los Angeles were "interested" within the meaning of section 47, subdivision 3, and that the newspaper's relation to the citizens was such as to afford "a reasonable ground for supposing the motive for the communication innocent," not because the publication was made in a newspaper but because "the official conduct of public officers, especially in a government by the people, is a matter of public concern of which every citizen may speak in good faith and without malice." (185 Cal. at p. 571. See also *Maher* v. *Devlin* (1928) 203 Cal. 207, 281-284 [263 P. 812]; cf. *Stevens* v. *Storke* (1923) 191 Cal. 329 [216 P. 371].)

In *Emde* v. *San Joaquin County etc. Council* (1943) 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916], the Supreme Court had occasion to consider section 47, subdivision 3 in the context of an allegedly false and defamatory publication concerning an employer involved in a labor dispute with a union, and appearing in the Stockton Labor Journal, a weekly newspaper devoted to the interests of organized labor. The court

---

the common interests of the field of sports psychology and that the communication in question was reasonably calculated to protect or further the interests of sport psychology in general at the time that the statements were made then a privilege attaches and a verdict for the defendants must be returned. However, the privilege available may be lost if the defendant abuses the privilege by excessive publication or the inclusion of immaterial matters which have no bearing upon the interest sought to be protected or if the statements are actuated by malice." The jury was also instructed that if it found the plaintiff's activities were of "legitimate interest to the defendants and to the recipients of the January 10, 1975 paper, then you are instructed that the defendants could legitimately comment upon and criticize the Institute's activities even though the criticism adversely affected the Institute's reputation and business." Finally, the jury was given instructions on malice which had been proposed by plaintiff.

concluded, without extensive discussion, that "since the comment was published in a newspaper devoted exclusively to the interests of organized labor, its publication was conditionally privileged." (*Id.*, at p. 161.)

Five years later, the court in *Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791 [197 P.2d 713], confronted a suit brought by two members of a church against the pastor and two of its lay leaders who, plaintiffs contended, were responsible for defamatory and false statements contained in charges brought against them before the church membership. The plaintiffs were expelled on the basis of the charges, and a press release reporting the action of the church was given the local press. On the question of privilege, the court stated: "Ordinarily, the common interest of the members of a church in church matters is sufficient to give rise to a qualified privilege to communications between members on subjects relating to the church's interest. [Citations.] A privilege would exist in this case if the publication had been made without malice and the occasion had not been abused." (*Id.*, at pp. 796-797.)

In *Maidman v. Jewish Publications, Inc.* (1960) 54 Cal.2d 643 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439], the court held that an editorial published in a newspaper principally directed to the Jewish community in Los Angeles, and containing defamatory statements about a prominent member of that community in relation to the Jewish observances, was conditionally privileged within section 47, subdivision 3. ▮ ▮▮▮ The court observed: "Although the editorial is libelous *per se*, the defendants properly contend that the complaint itself reveals the existence of the defense of 'fair comment.' 'It is not only the privilege but the duty of every citizen and every newspaper in the community to fairly and impartially criticize the faults and misconduct of public officers, . . .' [Citation.] Statements of opinion, although of a defamatory nature, are privileged in California under section 47, subdivision 3, of the Civil Code. [Citations.] Maidman held a position of importance in the Southern California Jewish community. It was therefore of legitimate interest to members of that community, who would be the most likely readers of the defendant newspaper, to know whether Maidman was qualified for his position. [Citation.] " (*Id.*, at pp. 651-652.)[4]

---

[4]At common law, the privilege for communication to interested persons and the privilege of fair comment were distinct, the latter being limited to assertions of opinion

Court of Appeal decisions have held section 47, subdivision 3 to apply to a variety of special relationships, e.g., to communications by an employer to its employees regarding alleged misconduct by a fellow employee, in order to explain the reasons for that employee's termination and thus preserve employee morale (*Deaile* v. *General Telephone Co. of California* (1974) 40 Cal.App.3d 841 [115 Cal.Rptr. 582]); a complaint by a physician to a local bar association of allegedly unethical conduct by an attorney member (*Katz* v. *Rosen* (1975) 48 Cal. App.3d 1032 [121 Cal.Rptr. 853]); and a complaint by parents of school pupils, addressed to the principal and asserting misconduct of a teacher. (*Martin* v. *Kearney* (1975) 51 Cal.App.3d 309 [124 Cal.Rptr. 281]. See generally, 4 Witkin, *op. cit. supra* (1980 supp.) § 307 p. 128.)

More broadly, articles appearing in a newspaper of general circulation and describing a raid on a house of prostitution were held to be within the scope of section 47, subdivision 3, despite the claim that they were partly false, on the ground that "the articles were published during times of war in a community where extensive war activities were being conducted, both civilian and military, and where the welfare of those engaged therein was a matter of vital concern to every right-thinking person" (*Glenn* v. *Gibson* (1946) 75 Cal.App.2d 649, 659 [171 P.2d 118]). The decision relied in part upon the comment to former Restatement of Torts section 598, to the effect that "An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that (a) facts exist which affect a sufficiently important public interest . . . ."

In *Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405 [46 Cal.Rptr. 135], plaintiffs, engineering contractors on a job with the City of Hayward, complained of a newspaper article which insinuated they were responsible for delay in completion of a street repair project

rather than fact. (See 1 Harper & James, The Law of Torts (1956) § 5.28, p. 456 et seq.) In California, the two privileges have been fused under the statutory privilege accorded by section 47, subdivision 3. Insofar as the privilege of fair comment protects only statements of opinion, as distinguished from assertions of fact, it has proved to be redundant in light of constitutional principles which preclude defamation liability for the expression of opinion. (See fn. 3, *ante*.) In California, however, the cases have extended the fair comment privilege so that, where malice is disproved, the privilege applies not only to comment (opinions) but to false statements of fact as well. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 310, p. 2580.) *Maidman* itself involved what could appropriately be characterized as false assertions of fact, i.e., the implication that plaintiff, in his professional capacity as a lawyer, deliberately misled a court as to the nature of a religious holiday. (54 Cal.2d at p. 651.)

and were incompetent, both in the preparation of their bids and in the performance of the job. In upholding the trial court's instruction to the jury that the communication was privileged under section 47, subdivision 3, this court reasoned as follows: "In California the 'fair comment' privilege is encompassed within the provisions of subdivision 3 of section 47. . . . It has been held that this qualified privilege exists *whether the publication be in the form of opinion or of false statements of fact. . . .* [¶] *The crucial issue involved in determining the applicability of the 'fair comment' privilege is whether or not the publication was made in the public interest. . . . [C]ontrary to plaintiffs' contention, the scope of the term 'public interest' in California is not limited to matters relat-. ing solely to public officials.* Both the cases of *Glenn* and *Maidman* applied the privilege to statements defaming *private individuals, where the subject matter of the article was determined to be of public interest or the defamed individual of renown among a certain interest group."* (*Id.,* at pp. 416-417, italics added. For similar broad applications of the § 47, subd. 3 privilege, see *Toney* v. *State of California* (1976) 54 Cal. App.3d 779, 793 [126 Cal.Rptr. 869]; *Lagies* v. *Copley* (1980) 110 Cal.App.3d 958, 968 [168 Cal.Rptr. 368].)

The section 47, subdivision 3 privilege is not without limits, however, as recently exemplified in *Rancho La Costa, Inc.* v. *Superior Court* (1980) 106 Cal.App.3d 646 [165 Cal.Rptr. 347]. In that case, owners and operators of a resort sued the publishers of a national magazine over an article which accused them of involvement with organized crime and sought to implicate them in the "Watergate" scandal, nationwide bank failures, securities frauds, criminal use of union monies and pension funds, as well as the swindle of many others, including churches. The court stated: "The state conditional privilege of section 47(3) does not apply to a publication by a magazine or newspaper merely because. it relates to a matter which may have general public interest. . . . [¶] The word 'interested' as used in the statute refers to a more direct and immediate concern. That concern is something other than mere general or idle curiosity of the general readership of newspapers and magazines." (*Id.* at pp. 664-665.) Distinguishing cases which applied the section 47, subdivision 3 privilege to defamatory comments related to public officials, and to publications "limited to a local or a special interest group and related to matters of special concern" (*id.,* at pp. 666-667), the court reasoned that "[w]hatever privilege is accorded defendants under Civil Code section 47(3), it must yield to the plaintiffs' constitutional rights of privacy." (*Id.,* at p. 667.) The court found extended discussion of the inapplicability of section 47, subdivision 3

unnecessary "because the only basis upon which defendants seek the benefit of the statute is by saying that the public at large, and hence that part thereof which constitutes its readership, is interested generally in the fight against organized crime. There being no specific evidence of any particular or specific subject matter of communication, no recital of the inadequacy of the evidence on the application of the section is necessary." (*Ibid.*)

The lesson we deduce from these cases is that the scope of the privilege under section 47, subdivision 3 is not capable of precise or categorical definition, and that its application in a particular case depends upon an evaluation of the competing interests which defamation law and the privilege are designed to serve. The Restatement Second of Torts (§ 595), seeking to formulate a general rule, suggests that an occasion is conditionally privileged "if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the recipient or a third person, and (b) the recipient . . . is a person to whom its publication is otherwise within the generally accepted standards of decent conduct." In addition, the Restatement suggests a privilege exists "if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." (§ 596.)

Harper and James in The Law of Torts, *supra*: "The occasion is privileged in all these cases when the interest which the defendant's act tends to protect or advance is sufficiently important and the harm threatened thereto is sufficiently great to require or at least justify withdrawal of the legal protection ordinarily given to the plaintiff's interest according to a social policy based upon communal standards of interest value and decent conduct." (§ 5.25, pp. 435-436.) And Professor Eldredge: "The common interest [to be shared by the recipient] must be a legitimate interest, *i.e.*, an interest which the law recognizes as worthy of protection and not an interest which springs from and seeks to gratify idle curiosity alone. 'The word "interest" as used in the cases, is not used in any technical sense. It is used in the broadest popular sense, as when we say that a man is "interested" in knowing a fact—not interested in it as a matter of gossip or curiosity, but as a matter of substance apart from its mere quality as news.' 'So long as the interest is of so tangible a nature that for the common convenience and welfare of society, it is expedient to protect it, it will come within the rule.'" (Eldredge, The Law of Defamation (1978) § 87, at p. 481.)

Determination that a privilege exists under section 47, subdivision 3 does not, of course, provide carte blanche for reckless or improperly motivated attacks on people's reputations. The occasion for the privilege "may be abused and the protection of the privilege lost, by the publisher's lack of belief, or of reasonable grounds for belief, in the truth of the defamatory matter, by excessive publication, by a publication of defamatory matter for an improper purpose, or if the defamation goes beyond the group interest." (*Emde v. San Joaquin County etc. Council, supra,* 23 Cal.2d 146, 154-155; *Brewer v. Second Baptist Church, supra,* 32 Cal.2d 791, 797.) "Thus the privilege is lost if the publication is motivated by hatred or ill will toward plaintiff [citations], or by any cause other than the desire to protect the interest for the protection of which the privilege is given. [Citations.] Although there are situations where the protection of the interest involved may make it reasonable to report rumors or statements that the publisher may even know are false [citations], ordinarily the privilege is lost if defendant has no reasonable grounds for believing his statements to be true." (*Brewer v. Second Baptist Church, supra,* at p. 797. See also *Stationers Corp. v. Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 418 [42 Cal.Rptr. 449, 398 P.2d 785]; *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 552 [343 P.2d 36]; cf. *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 944-945 [160 Cal.Rptr. 141, 603 P.2d 58]; *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413-414 [134 Cal.Rptr. 402, 556 P.2d 764].)

 In this case, unlike *Rancho La Costa*, the communication was not directed toward the world at large, but mainly toward those involved as professionals in the field of athletics. And those to whom it was directed had a potential interest in the subject matter which went well beyond general or idle curiosity. The coaches who comprised the various organizational recipients of Martens' letter constituted a group with a special concern for the subject matter of the communication: depending upon how they evaluated it, the communication could affect the manner in which they conducted their professional activities. If the contents of the communication were true, it was of professional importance for them to know it.

Moreover, the context of the communication was such that, unlike the situation in *Rancho La Costa*, the subjects of the alleged defamation could reasonably be expected to have adequate opportunity for response. The record is replete with references to professional conferences and publications in which the subject of sports testing was discussed. Indeed, the representative of the National Basketball

Coaches Association who wrote Martens to advise him that his letter would be used in a forthcoming bulletin, made reference to the fact that Tutko "has twice talked at our National Convention, and had standing-room audiences with a great reception for his presentation." The primary focus of the communication was an academic-professional marketplace of ideas.

*Rancho La Costa* is also distinguishable for the substantiality of the privacy interests there implicated and stressed by the court. Here the subject matter of the communications did not involve some private aspect of individual or corporate life. Plaintiff entered the arena of public controversy by offering the AMI to the athletic community and by representing it as a valid indicator of behavioral response. The subject matter of the communication was directly related to that representation. (Cf. *Mashburn* v. *Collin* (La. 1977) 355 So.2d 879; Annot., 96 A.L.R.3d 609.)

Finally, Martens in his capacity as professor and student of sports psychology was one who stood in such a relation to the persons interested as to afford reasonable ground for supposing the motive for the communication to be innocent. That is not to say that his motive was in fact innocent, or that there was not evidence from which the jury might have concluded that his motives were selfish, just as there was evidence from which the jury might have concluded that Martens did not have reasonable basis for believing the statements to be true, or that he abused the privilege by disseminating the communication to an unreasonably broad group of recipients or by including in his communication statements not reasonably necessary to further the interests which he allegedly sought to protect. Those, however, were questions for the jury. ▮ In determining whether there exists an occasion for privilege, "the courts . . . have to deal with the law of general averages based on human experience and must shape a general policy to deal with a general problem. On the other hand, in the question of abuse of privilege, the problem is one of particulars." (1 Harper & James, The Law of Torts, *supra*, § 5.25, p. 438.)

▮ Insofar as the trial court by its instructions left to the jury the legal question as to whether a privileged occasion existed, that was arguable error,[5] but that error could hardly operate to plaintiff's

---

[5]Ordinarily, the existence of the privilege is a legal question for the court. (*Kramer* v. *Ferguson* (1964) 230 Cal.App.2d 237, 245 [41 Cal.Rptr. 61]; *Gantry Constr. Co.* v.

detriment. Viewing the instructions as constituting in effect, a determination by the trial court that a privileged occasion did exist, we find no error.[6] And plaintiff is in no position to complain of the instructions which the court gave to the jury concerning malice, since the only instructions given on that topic were those which plaintiff proposed.[7] The judgment is affirmed.

Elkington, Acting P. J., and Newsom, J., concurred.

A petition for a rehearing was denied January 26, 1981, and appellant's petition for a hearing by the Supreme Court was denied February 25, 1982.

---

*American Pipe & Constr. Co.* (1975) 49 Cal.App.3d 186, 197 [122 Cal.Rptr. 834]; *Field Research Corp.* v. *Patrick* (1973) 30 Cal.App.3d 603, 609 [106 Cal.Rptr. 473].) While the jury may be required to determine disputed facts relating to the existence of the privilege, it is for the court to decide whether the facts found by the jury made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged. (Rest.2d Torts, § 619, com. a.) Here, since the court did not do that, we regard the issue on appeal as whether there existed a privilege as a matter of law.

[6] We do not mean to suggest approval of the court's privilege instructions as exemplars. Indeed, as our opinion indicates, qualifications would have been appropriate. But where the instruction states the law correctly and is "'deficient merely by reason of generality,'" a party may not complain of its lack of completeness unless he requested an additional or qualifying instruction. (*Agarwal* v. *Johnson, supra*, 25 Cal.3d 932, 948-949.)

[7] Plaintiff complains that the court misled the jury by responding to a request for clarification by rereading all relevant instructions. We find no reversible error.