Filed 2/28/25  Vanga v. Juarez CA1/5
Opinion following rehearing
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| KING VANGA,<br>        Plaintiff and Respondent,<br>v.<br>PRISCILLA N. JUAREZ,<br>        Defendant and Appellant. | A169427<br><br>(San Francisco County<br>Super. Ct. No. CGC-23-606993) |
| KING VANGA,<br>        Plaintiff and Respondent,<br>v.<br>ANTHONY JOSEPH HIDALGO,<br>        Defendant and Appellant. | A169948<br><br>(San Francisco County<br>Super. Ct. No. CGC-23-606993) |
| KING VANGA,<br>        Plaintiff and Respondent,<br>v.<br>KATHLEEN A. JUAREZ,<br>        Defendant and Appellant. | A169976<br><br>(San Francisco County<br>Super. Ct. No. CGC-23-606993) |

In this defamation lawsuit, defendants Priscilla N. Juarez, Anthony Joseph Hidalgo, and Kathleen A. Juarez (collectively, Defendants)[1] appeal

_____

[1] For convenience, we will refer to the individual Defendants by their first names.  No disrespect is intended.

1

from the trial court's orders denying their special motions to strike pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP statute.[2]  We reverse the court's order on Priscilla's motion, and affirm in part and reverse in part the orders on Anthony and Kathleen's motions.

BACKGROUND

*The Car Accident*

On June 25, 2021, plaintiff King Vanga (Plaintiff) was involved in a car accident that resulted in the deaths of two of Defendants' relatives (Decedents).

Subsequently, Defendants read news articles reporting that Plaintiff had been arrested and law enforcement stated he was driving at high speeds and was under the influence of drugs and/or alcohol at the time of the accident.  Kathleen and Priscilla saw Plaintiff's online booking information stating he had been arrested for battery against a peace officer, resisting or obstructing a peace officer, removing a firearm from a peace officer, vehicular manslaughter with gross negligence, and two counts of driving under the influence causing bodily injury.  Kathleen also watched a video showing the immediate aftermath of the accident that was posted on social media by an eyewitness.

On June 29, 2021, Kathleen and her husband talked to two California Highway Patrol (CHP) officers about the accident.  The officers informed them that Plaintiff "was determined to be under the influence of alcohol at the time of the collision" and "was suspected of being under the influence of drugs in addition to alcohol"; Plaintiff "acted violently and fought when he

---

[2] "SLAPP" stands for "strategic lawsuits against public participation." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 615.)

All undesignated statutory references are to the Code of Civil Procedure.

was contacted by [local] police" and "reached for an officer's gun"; and "Officer Fuentes, one of the . . . officers that dealt with [Plaintiff] at the scene," "smelled alcohol on [Plaintiff]" and "asked him to submit to a breathalyzer, but [Plaintiff] refused and asked for an attorney, so he was taken to the hospital to be treated for his injuries pending the warrant for his blood sample." Kathleen and her husband relayed this information to other family members, including Priscilla and Anthony. In subsequent conversations with Officer Fuentes, in late June or July, Officer Fuentes also informed Kathleen that eyewitnesses had estimated Plaintiff "was driving around 100 mph."

On June 30, 2021, a criminal complaint was filed charging Plaintiff with two counts of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)); resisting an executive officer by force or violence (*id.*, § 69); attempting to take a peace officer's firearm (*id.*, § 148, subds. (a), (d)); and battery upon a peace officer (*id.*, § 243, subd. (b)). Defendants reviewed the complaint.

*Kathleen's Letters*

On June 29, 2021, Kathleen wrote a letter to Stanford University (Stanford), where Plaintiff was then enrolled as an undergraduate student: "It is my understanding that [Plaintiff] is currently a student of your university in the Computer Science program, scheduled to graduate in 2023. From a brief overview of your university's website, it is my understanding that Stanford stands for excellence with a strong foundation in ethics. For this reason, I believe it is crucial to inform your university that your current student [Plaintiff] does not encompass Stanford's values and is a stain on your university's reputation.

"On June 25, 2021, your student, [Plaintiff,] at the age of 20 years old, drove while intoxicated (currently believed to have been under the influence

3

of both alcohol and drugs) at a high rate of speed, and murdered my in laws, [Decedents], in Atwater, California.

"After murdering my in laws, it is my understanding from both the news articles as well as his booking information that he attempted to flee the scene, resisted arrest, battered/assaulted police officers, and attempted to grab a police officer's firearm. It is my information and belief that this is not [Plaintiff's] first charge of driving under the influence."

After setting forth Decedents' large family and some biographical details, Kathleen described Decedents as "the most loving and genuine human beings that I have been fortunate enough to encounter in my life," and stated, "Due to your student [Plaintiff's] actions, my family has lost the two most important people in our lives. We have been robbed of the many years of memories that we would have shared together. Because of [Plaintiff], my child will never meet their grandparents or share in their love. My life will never be the same. I am broken, we are all broken."

Kathleen continued, "I know that I cannot control what action is taken by Stanford with respect to [Plaintiff], but I hope this letter has shed light to your institution of the poor moral character of your student, who by association with your university, is a direct reflection of Stanford. It is my belief that this student does not possess the caliber of character that is required to represent your institution.

"In the event that your school does in fact value ethics and responsibility, I strongly urge you to reconsider the status of this student [Plaintiff]. While we hope that he is held accountable for his actions through the justice system for the countless charges that are included in his arrest record for this incident, I truly hope that your institution holds him accountable as well."

4

On July 26, 2021, Kathleen sent a second communication to Stanford, via email, including links to news articles about the accident and attaching a copy of the criminal complaint: "I am writing this email on behalf of the Juarez family. One month ago, we received the worst news of our lives. We were informed that our loved ones, my husband's parents, [Decedents], had both been killed in a collision after your student [Plaintiff] crashed into their vehicle at a high rate of speed causing their vehicle to instantly become engulfed in flames as it propelled to the opposite side of the roadway. Our information from the CHP at the accident scene was that upon contact with your student, [Plaintiff], the officers smelled an odor of alcohol on his person.

"We are informed that after refusing to submit to a breath test, the officer attempted to place your student, [Plaintiff,] under arrest, at which time he became combative with the officers while resisting arrest. This information is further supported by the charges included in the attached Criminal Complaint filed by the State of California against your student, [Plaintiff], which include two counts of felony gross vehicular manslaughter while intoxicated, felony resisting executive officer (resisting arrest), felony attempted firearm removal (after attempting to take an officer's firearm in the course of the arrest), and misdemeanor battery on a peace officer (after using force against the officer attempting to effectuate the arrest).

"At the July 16th arraignment, the Judge [o]rdered your student [Plaintiff] to wear an ankle monitor while out of custody after having paid the $415,000.00 bail. However, the attorney for your student [Plaintiff] requested for the Court to grant an exemption for attending school, which would be your school, Stanford University. It troubles us to think that such a prestigious university such as Stanford would allow a student, whom we presume has blatantly violated your University's code of conduct, to return

after engaging in the conduct detailed in the attached Criminal Complaint. It is our opinion that such a student is a stain on Stanford's reputation and should no longer be permitted to be a representative of your University, as each of your students are direct reflections of Stanford's values.

"We have included various links to articles by Merced Daily, Merced Sun Star, and various other online periodicals, detailing the incident as well as including the story of [Decedents] . . . mother and father to six children, grandparents to fifteen (15) grandchildren, with two additional grandchildren arriving in October of 2021 and January of 2022. We have also included the link to the ABC 30 news coverage of this incident and the impact on us all as the family. On Tuesday, July 20th, we laid [Decedents] to rest in Norco, California. It is estimated that over 350 people were in attendance at their services. So many family members and friends are left mourning the loss of two of the most loving and selfless individuals to grace this earth.

"While we are hopeful that justice will be served in relation to the Criminal Proceeding, we hope that Stanford will uphold the code of conduct, specifically wherein your website details, 'Students at Stanford are expected to show both within and without the University such respect for order, morality, personal honor and the rights of others as is demanded of good citizens.' We believe that the circumstances detailed herein and in the attached Criminal Complaint are sufficient to warrant expulsion from your prestigious university. At a minimum, we presume that Stanford would want to protect your community of students from an individual charged with the felony and misdemeanor counts included in the Complaint, as some of these charges include violent offenses using force."

In late July and early August, Stanford sent Kathleen two emails acknowledging receipt of her communications.

6

*Priscilla's Letter*

On July 2, 2021, Priscilla wrote an email to Stanford: "I am writing this letter to you because it has been brought to my attention that one of your students, [Plaintiff], whom [*sic*] is currently in your Computer Science Program projected to graduate 2023, has violated and tainted Stanford[']s Code of Conduct values, to the most extreme measure. As stated in Stanford University's Code of Conduct policies, 'All members of the University Community are responsible for sustaining the high ethical standards of this institution, and the broader community in which we function.' Stanford University's code also states that, 'This code is a shared statement of our commitment to upholding the ethical, professional and the legal standards we use and the basis for our daily and long term decisions and actions.' You state that all members of this community MUST comply with these policies, standards, laws and regulation.

"On the night of June 25th, 2021 at approximately 9:40 pm [Plaintiff] was arrested and detained in Atwater, C[A] on multiple charges. One of which was murdering my beloved in-laws[, Decedents]. Both only 56 years old. Police reports claim that [Plaintiff], 20 years old[,] was driving at an extremely accelerated speed on Santa Fe ave [*sic*] in Atwater[,] California all while intoxicated most likely by both alcohol and drugs. Not only was he completely irresponsible but also underage. My husband, myself and his family are completely broken and devastated. This does not even begin to explain the pain we feel.

"After murdering both of my in-laws it is my understanding, and knowledge that [Plaintiff], (20) had tried to flee the scene after slamming into my in-laws sending their car 40+ feet from the collision point. After police arrived and tried detaining [Plaintiff], he then tried to grab the officer[']s

7

weapon and obstructed the officer[']s attempt to arrest him. There are witness [*sic*] to attest to these behaviors committed by [Plaintiff], and police reports that confirm his actions."

After sharing "a little bit about who my in-laws were and just how important they were to my husband, myself and all who knew them," Priscilla wrote, "[Decedents] were incredibly loved and admired by all of their children and there are honestly no words to describe the heartache we are all feeling. [¶] Due to the poor judgment, behaviors and actions of your student, [Plaintiff], to say we are devastated broken [*sic*] would be an understatement."

Priscilla continued, "I understand that it is not my place to take action or allocate his consequences within the judicial system nor with Stanford, however, I do believe that all who commit such a crime should in fact and must be held responsible for their irresponsible actions and behaviors. In this case those behaviors led to the murder of my two amazing in-laws [Decedents]. I truly believe that [Plaintiff] is Not [*sic*] the kind of person you want representing your institution nor your community in which [*sic*] you hold in such high regards. I would hope that Stanford would take proper action in dismissing this man as an active student of your morally prestigious institution."

*Anthony's Letter*

On July 7, 2021, Anthony sent an email to Stanford: "It is my understanding that [Plaintiff] is currently a student of your university in the Computer Science program, scheduled to graduate in 2023. To my knowledge, Stanford is a world-renowned institution which holds its community to a very high standard. For this reason, I believe it is crucial to inform your university that your current student [Plaintiff] does not embody

8

Stanford's values and is truly a stain on the reputation of the University, staff, faculty and the student body.

"On June 25, 2021, Stanford student, [Plaintiff,] at the age of 20 years old, drove while intoxicated at a high rate of speed, and murdered my grandparents, [Decedents], in Atwater, California.

"After murdering my grandparents in the collision, it is my understanding from both the news articles as well as his booking information that he attempted to flee the scene, resisted arrest, battered/assaulted police officers, and attempted to grab a police officer's firearm. Our information has led us to believe that this is not [Plaintiff's] first charge of driving under the influence."

After describing Decedents, Anthony wrote, "Due to your student [Plaintiff's] inexcusable actions, my family has lost the two most important people in our lives. We have been robbed of the many years of memories that we would have shared together. Because of [Plaintiff], my life, our lives, of [*sic*] all changed forever. The outpour of love and support for [Decedents] is testimony to the wonderful people they were. Hundreds of lives are forever changed because of the actions of [Plaintiff]."

Anthony continued, "I know that I cannot decide what action is taken by Stanford with respect to [Plaintiff], but I hope this letter has shed light to your institution of the poor moral character of your student. By association with your university, [Plaintiff] is a direct reflection of Stanford. It is my belief that this student does not possess the caliber of character that is required to represent your institution.

"In the event that your school does in fact value ethics and responsibility, I strongly urge you to reconsider the status of this student [Plaintiff]. While we hope that he is held accountable for his actions through

9

the justice system for the countless charges that are included in his arrest record for this incident, I truly hope that your institution holds him accountable as well."

*Subsequent Events and Procedural History*

Between August 2021 and April 2022, multiple analyses of Plaintiff's blood sample from the night of the accident showed no alcohol or drugs present. In 2023, Plaintiff's criminal complaint was amended to change the two counts of gross vehicular manslaughter while intoxicated to two counts of vehicular manslaughter (Pen. Code, § 192, subd. (c)(1)). Plaintiff denies driving under the influence of drugs and/or alcohol, driving recklessly or unreasonably, attempting to flee the scene, resisting peace officers, refusing a breathalyzer test, or having a prior charge for driving under the influence (DUI).

At some point, Plaintiff requested access to his Stanford student file. In October 2022, Stanford granted access and Plaintiff viewed Defendants' letters for the first time.[3]

In June 2023, Plaintiff filed the underlying defamation lawsuit over Defendants' letters to Stanford.[4] Defendants each filed anti-SLAPP motions seeking to strike the operative first amended complaint. The trial court found Defendants' letters were protected activity under the anti-SLAPP law, but further found Plaintiff demonstrated a probability of prevailing on the

---

[3] For convenience, we refer to all of Defendants' communications to Stanford as letters, although most were sent via email. Stanford initially redacted Defendants' names; Plaintiff learned their identities after receiving the unredacted letters in response to a subpoena following the filing of this lawsuit.

[4] A fourth defendant was dismissed with prejudice by Plaintiff.

10

merits of his defamation claim against each Defendant. The trial court denied Defendants' motions, and these appeals followed.[5]

## DISCUSSION

"A court evaluates an anti-SLAPP motion in two steps. 'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.] If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.) " ' "We review de novo the grant or denial of an anti-SLAPP motion." ' " (*Muddy Waters, LLC v. Superior Court* (2021) 62 Cal.App.5th 905, 916.)

Defendants argue the trial court erred in finding Plaintiff established a probability of prevailing on his defamation claims against them. Plaintiff disagrees and also argues we should affirm on the alternate ground that Defendants' letters are not protected conduct under the anti-SLAPP statute. (See *Klem v. Access Ins. Co.* (2017) 17 Cal.App.5th 595, 609 ["A prevailing party on an anti-SLAPP motion need not file a cross-appeal to preserve his disagreement with the trial court's reasoning"].)

I.   *Step One: Protected Activity*

The trial court found Defendants' letters constituted protected activity under section 425.16, subdivision (e)(2): "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." We agree.

---

[5] We previously issued a nonpublished opinion in case No. A169427, then granted rehearing. After granting rehearing, we consolidated the three appeals for argument and decision on our own motion.

11

"[A] statement is 'in connection with' litigation under section 425.16, subdivision (e)(2) if it relates to the substantive issues in the litigation and is directed to persons having some interest in the litigation." (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266 (*Neville*).) The provision "has been held to protect statements to persons who are not parties or potential parties to litigation, provided such statements are made 'in connection with' pending or anticipated litigation." (*Id.* at p. 1270.) It is undisputed that Defendants' letters relate to the issues in Plaintiff's pending criminal case and expressly reference Plaintiff's arrest and charges. Moreover, Stanford, where Plaintiff was enrolled as an undergraduate student, had some interest in Plaintiff's criminal case: both an interest in the welfare of Plaintiff and his fellow students,[6] as well as a concern for its own reputation.

Plaintiff argues Defendants' letters are not protected conduct under section 425.16, subdivision (e)(2) because Stanford does not have the right *kind* of interest in Plaintiff's criminal case. While conceding that courts have not defined the precise contours of the requisite interest, Plaintiff relies on cases defining the litigation privilege for the proposition that an interest under subdivision (e)(2) must be "an economic interest in the litigation or a risk of liability resulting from the litigation." We reject Plaintiff's attempt to equate anti-SLAPP-protected activity with conduct covered by the litigation privilege. An "attempted analogy between the litigation privilege and the anti-SLAPP statute is inapt. . . . [T]he litigation privilege is an entirely different type of statute than section 425.16. The former enshrines a substantive rule of law that grants absolute immunity from tort liability for

---

[6] Plaintiff averred that in December 2021, Stanford sent him a letter referring to the criminal case and expressing "concern[] for your mental and physical wellbeing . . . , as well as for the safety of the university community . . . ."

12

communications made in relation to judicial proceedings [citation]; the latter is a procedural device for screening out meritless claims." (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 737.) While "courts 'look[] to the litigation privilege [Civil Code section 47] as an aid in construing the scope of [section 425.16,] subdivision [(e)(2)] with respect to the first step of the two-step anti-SLAPP inquiry,' " the applicability or inapplicability of the litigation privilege "does not resolve whether [a communication] is a protected activity under section 425.16, subdivision (e)(2)." (*Neville, supra,* 160 Cal.App.4th at p. 1263.)

Cases involving the first prong of the anti-SLAPP analysis make clear that the communication recipient's interest in the covered proceeding does not need to be economic or involve a risk of liability, or have otherwise defined the requisite interest more broadly than the test plaintiff proposes. Most notably, anti-SLAPP cases have held letters or articles published in newspapers regarding legislative, executive, or judicial proceedings to be protected activity under section 425.16, subdivision (e)(2), where the recipient is the general public. (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1160–1161 [party's letter relating to issues in pending litigation published in newspaper constituted protected activity under subdivision (e)(2)]; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863 [newspaper articles covering issue before county board of supervisors and state and federal courts constituted protected activity under subdivision (e)(2)].) In light of these cases, and mindful of the Legislature's directive that the anti-SLAPP statute "shall be construed broadly" (§ 425.16, subd. (a)), we reject Plaintiff's attempt to limit the application of subdivision (e)(2) to communications sent to parties with an economic interest or risk of liability in the proceeding.

Plaintiff next relies on the litigation privilege to argue section 425.16, subdivision (e)(2) does not apply because Defendants' letters did not further the objectives of a party in the criminal case. Even in the context of the litigation privilege, this standard has not been applied to require, as Plaintiff suggests, that Defendants' letters "seek evidence, testimony, an investigation, or a potential resolution of" Plaintiff's criminal case. " 'To be protected by the litigation privilege, a communication must be "in furtherance of the objects of the litigation." ' [Citation.] [¶] Put differently, the statement must ' "be connected with, or have some logical relation to, the action, i.e., . . . not be extraneous to the action." ' " (*Bassi v. Bassi* (2024) 101 Cal.App.5th 1080, 1097.) Defendants' letters noted criminal charges had been brought against Plaintiff and discussed the factual allegations underlying the charges as well as supporting evidence. Like the criminal prosecution, Defendants' letters sought to hold Plaintiff accountable for his conduct on the night of the accident based on the results of the criminal investigation. We agree with the trial court that the letters constituted protected activity under subdivision (e)(2).[7] (Cf. *Bassi*, at p. 1098 [communications not covered by subdivision (e)(2) where the content was "irrelevant or highly peripheral to the proposed . . . litigation"].)

II.   *Step Two: Probability of Prevailing*

" ' "Defamation is 'a false and unprivileged publication that exposes the plaintiff "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his

---

[7] Because of this conclusion, we need not and do not decide whether, as the parties dispute, Defendants' letters are also protected activity under section 425.16, subdivision (e)(4), covering "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

14

occupation." ' " ' " (*Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 685 (*Dickinson*).)

Plaintiff argues the following statements are defamatory: Plaintiff murdered Decedents; Plaintiff drove under the influence; Plaintiff drove at a high rate of speed; Plaintiff attempted to flee the scene; Plaintiff refused to take a breathalyzer test (asserted only by Kathleen); Plaintiff violated Stanford's code of conduct (asserted only by Priscilla and Kathleen); and Plaintiff had previously been charged with a DUI (asserted only by Anthony and Kathleen). Where appropriate, we will analyze the challenged statements separately. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010 ["Analysis of an anti-SLAPP motion is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion."].)

A.      *Common Interest Privilege*

Defendants argue all of their statements are covered by the common interest privilege and are therefore privileged if made without malice. We disagree.

Civil Code section 47, subdivision (c) provides that a communication is privileged if made "without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." " ' "The defendant has the initial burden

15

of showing the allegedly defamatory statement was made on a privileged occasion, whereupon the burden shifts to the plaintiff to show the defendant made the statement with malice. [Citation.] The existence of the privilege is ordinarily a question of law for the court." ' " (*Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1119 (*Hui*).)

For purposes of the common interest privilege, " '[t]he "interest" must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship or the defendant is protecting his own pecuniary interest.' " (*Hui*, *supra*, 222 Cal.App.4th at pp. 1118–1119.) " ' "One authority explains the statutory interest as follows: (1) The 'interest' applies to a defendant who 'is protecting his own pecuniary or proprietary interest[]' (2) The required 'relation' between the parties to the communication is a contractual, business or similar relationship[,] (3) The 'request' referred to must have been in the course of a business or professional relationship." ' " (*Id.* at p. 1119; see also *id.* at pp. 1119–1120 [common interest privilege protected communication between employees of insurance company and claimant's attorney because they "shared a business relationship" and had "a common interest in resolving the claim"]; *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 949 [" 'Communications made in a commercial setting relating to the conduct of an employee have been held to fall squarely within the qualified privilege for communications to interested persons' "].)

"This definition is not exclusive, however," as the scope of the common interest privilege " 'is not capable of precise or categorical definition, and . . . its application in a particular case depends upon an evaluation of the competing interests which defamation law and the privilege are designed to serve.' " (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 914.) Defendants

16

rely on cases finding privileged communications where the common interest was not business-related or pecuniary; for example, statements about an inappropriate relationship between church youth group leaders and a member youth, where the statements were made by church leaders to church members and nonmember parents of youths in the youth group. (*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1538–1539, 1556–1557; see also *Kashian, supra,* 98 Cal.App.4th at pp. 899–901, 928, 930 [letter requesting an investigation into the plaintiff's possible conflict of interest in his role as chair of a community hospital organization's board of trustees, that was copied to groups with pending requests for investigation into the organization's business practices, was covered by the privilege because "the two subjects ([the community hospital organization's] business practices and [the plaintiff's] potential conflict) were sufficiently interrelated that the parties to the two requests shared a common business or professional interest in them"]; *Katz v. Rosen* (1975) 48 Cal.App.3d 1032, 1034–1037 [doctor's letter to local bar association complaining about an attorney's conduct relating to fees incurred in the doctor's examination of the attorney's client was protected by the privilege because "the association's medical-legal subcommittee assists doctors and lawyers to resolve their differences"].)[8]

---

[8] Defendants also rely on *Institute of Athletic Motivation v. University of Illinois* (1980) 114 Cal.App.3d 1, which held a letter criticizing the plaintiff's " 'sports-specific' psychological test" written by a professor of sports psychology to professional athletic associations and sports magazines was covered by the privilege. (*Id.* at pp. 4, 12.) However, the Supreme Court subsequently observed the case applied the privilege "even though the communication was made to a fairly large group of persons who arguably did not have a closely shared interest" and "express[ed] no view as to whether the court was correct in finding a privilege on those facts." (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 737, fn. 22 (*Brown*).)

Nonetheless, our Supreme Court has indicated the privilege should not apply too broadly. The Supreme Court explained that, at common law, the common interest privilege "applied to a narrow range of private interests. The interest protected was private or pecuniary; the relationship between the parties was close, e.g., a family, business, or organizational interest; and the request for information must have been in the course of the relationship." (*Brown*, *supra*, 48 Cal.3d at p. 727.) The privilege "applied to essentially *private* interests, . . . and there had to be a genuine *common* interest." (*Id.* at p. 729.) "The legislative history [of current Civil Code section 47, subdivision (c)] indicates the Legislature intended to codify the narrow common law privilege of common interest . . . ." (*Id.* at p. 727; see also *id.* at p. 726, fn. 13 ["there are no significant substantive differences between the present version and the original statute"].)

Thus, "a publication or broadcast by a member of the news media to the general public regarding a private person is not privileged under [the common interest privilege] regardless of whether the communication pertains to a matter of public interest." (*Brown*, *supra*, 48 Cal.3d at p. 738.) Another example of the limits of the privilege is found in *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90 (*Mann*), disapproved of on another ground in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396. In *Mann*, former independent contractors with the plaintiff water system maintenance company told the plaintiff's customers that the plaintiff was putting illegal chemicals into public drainage systems. (*Id.* at pp. 100–101.) The Court of Appeal held the common interest privilege did not apply: "Defendants presented no evidence showing they had any type of relationship with [the plaintiff's] customers or that [the plaintiff's] customers requested the information. Because defendants and [the plaintiff] are business competitors,

18

it is not reasonable to assume that the motive of the communication was innocent; rather, it appears defendants' only interest was to gain [the plaintiff's] customers as their own. If we were to accept defendants' unsupported argument, business competitors would be free to publish defamatory statements about the business practices of a rival to its rival's customers by merely contending the customers were 'interested' in the subject matter of the communication." (*Id.* at p. 109.)

Defendants have no business, contractual, or similar relationship with Stanford; however, they contend they share various interests. First, Defendants argue they and Stanford share an interest in holding Plaintiff accountable for his actions. Defendants are indisputably so interested, as Decedents' relatives who believe Plaintiff was responsible for their deaths, but there is no evidence that Stanford shares this interest. Plaintiff's conduct relating to the accident did not take place on Stanford's campus and had no connection with Plaintiff's status as a Stanford student. Defendants point to Stanford's letter to Plaintiff characterizing the charges as "very serious" and articulating its concern for "the safety of the university community." Stanford's interest in the safety of its students, both Plaintiff and the broader student body, is not equivalent to an interest in holding Plaintiff accountable.

Defendants next argue they share Stanford's interest in the safety of Stanford students. Defendants identify no connection between any of them and Stanford or its student body, apart from Plaintiff's status as a student there. To the extent Defendants have an interest in the safety of Stanford students, they do so only as members of the general public. This is insufficient for purposes of the common interest privilege.

Finally, Defendants argue they and Stanford share an interest in the events surrounding the accident. In the absence of *any* relationship between

19

Defendants and Stanford or a request by Stanford for information about the accident, this highly generalized interest is insufficient. Indeed, as Defendants' letters make clear, their purpose in writing Stanford was to persuade Stanford to expel Plaintiff, in service of Defendants' interest in holding him accountable for his alleged conduct. This interest is not protected by the common interest privilege. (See *Mann*, *supra*, 120 Cal.App.4th at p. 109.) The cases relied on by Defendants are distinguishable, involving parties with preexisting relationships and/or a more concrete and specific shared interest.

In sum, Defendants fail to establish that the common interest privilege applies to their letters.

B.  *Nonactionable Opinion*

Defendants contend certain of the challenged statements are nonactionable opinions. We find Defendants' statements that Plaintiff murdered Decedents, drove under the influence, drove at excessive speeds, refused a breathalyzer test, tried to flee the scene, and violated Stanford's code of conduct are nonactionable opinions. However, we find the statement that Plaintiff had a prior DUI charge is not.

1.  *Legal Background*

"An opinion is not actionable if it discloses all the statements of fact on which the opinion is based and those statements are true. [Citation.] An opinion is actionable if it discloses all the statements of fact on which the opinion is based and those statements are false.' " (*Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 527 (*Integrated Healthcare*).) "The rationale for this rule is that '[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely

to construe the statement as insinuating the existence of additional, undisclosed facts.' [Citation.] When the facts supporting an opinion are disclosed, 'readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.' " (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 387 (*Franklin*).)

Courts use a "totality of the circumstances test . . . to determine whether the statement in question" is an actionable or nonactionable opinion. (*Franklin*, *supra*, 116 Cal.App.4th at p. 385.) "Under the totality of the circumstances test, '[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered.' " (*Ibid.*) " 'This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.' " (*Id.* at p. 389.)

Two cases are illustrative. In *Franklin,* the defendant wrote emails to one of the plaintiff's clients that included the following: " 'I thought you might find this e-mail from [the plaintiff] very disturbing. Please follow the path. [] [The plaintiff] stole copyrighted materials from [a third party] and placed this data on their websites as their own. Please review the music wire 2.50 inch crimped prints. [T]hey still have [the third party's] title block on the documents. . . .' " (*Franklin, supra*, 116 Cal.App.4th at p. 380.) The Court of Appeal held the emails "purported to interpret copyright law and contract law and apply that law to fully disclosed facts," to wit, a website and link therein included in the defendant's emails. (*Id.* at p. 387.) The "e-mails disclosed the facts on which [the defendant's] opinions were based and did not imply the existence of any other facts on which the opinions were based." (*Id.*

21

at p. 388.) "The facts upon which [the defendant's] opinions were based were provably true because the existence, content, and layout of the Web sites were not in dispute in any material way. Because we are not determining the truth or reasonableness of [the defendant's] opinions, the issue in determining whether the Web sites were provably true is not whether the Web sites made truthful assertions of fact, but whether the Web sites in fact existed and made the assertions claimed." (*Ibid.*) In considering the context, the court also noted the defendant "is not, and did not purport to be, an attorney. The average reader therefore would not have assumed the statements in the . . . e-mails had the weight of a legal opinion. Although [the defendant] did not temper his opinions with words of transparency, neither did he present his opinions as legal truths framed in legal verbiage." (*Id.* at p. 389.) The court concluded the statements in the emails were nonactionable opinions. (*Id.* at p. 390.)

In *Integrated Healthcare,* the defendant wrote an email stating the plaintiff, a company operating certain hospitals, " 'appears to be underwater and I don't think [the plaintiff] can get an investor to pony up the $20 million, for the 60–70 million shares of stock which they are selling. Admissions are down 20%. They got a reduction of costs by dumping [a company from which the plaintiff acquired hospitals] by 13%, and increased insurance payment of 7% (but that is neutralized by the factoring). Then their nursing salaries went up 8%—so they're in the red. No way to get out. That is ominous. What would the buyer get buying [the plaintiff's] stock? Control of [the plaintiff], but not the land? Sounds like its [*sic*] going BK [(bankrupt)]. . . .' " (*Integrated Healthcare*, *supra*, 140 Cal.App.4th at p. 520.) The Court of Appeal held the email stating the defendant's "opinions" that the plaintiff "is 'underwater,' [the plaintiff] is unable to find investors to purchase its stock,

22

and it is going bankrupt" also "set[] forth the basis for these opinions and does not imply other facts. Specifically, these opinions appear based on the following facts: 'Admissions are down 20%. They got a reduction of costs by dumping [a company] by 13%, and increased insurance payment of 7% (but that is neutralized by the factoring). Then their nursing salaries went up 8% . . . .' Because the e-mail discloses the facts underlying [the defendant's] opinions, the opinions are actionable only if these facts are false." (*Id.* at p. 529.)

2.     *Analysis*

We first consider the language of Defendants' letters. "In considering the *language* of the statement itself, we look at whether the purported opinion discloses all of the facts on which it is based and does not imply that there are other, unstated facts which support the opinion. If that is the case, the statement is defamatory only if the disclosed facts themselves are false and defamatory. [Citation.] We also consider whether the statement was cautiously phrased in terms of the author's impression." (*Dickinson, supra,* 17 Cal.App.5th at p. 686.) Like the communications in *Franklin* and *Integrated Healthcare,* Defendants' letters included both the challenged assertions—i.e., that Plaintiff murdered Decedents and drove while intoxicated—and the facts upon which the assertions were apparently based. Kathleen's first letter relied on "news articles as well as [Plaintiff's] booking information"; and her second relied on "information from the CHP at the accident scene," "the charges included in the attached Criminal Complaint," and "links to articles by . . . online periodicals" included in the letter. Priscilla's letter relied on "witness . . . and police reports" and Plaintiff's arrest and detention "on multiple charges." Anthony's letter relied on "news articles as well as [Plaintiff's] booking information."

23

As to the statements that Plaintiff murdered Decedents, drove while intoxicated, drove at excessive speeds, tried to flee, refused a breathalyzer test, and violated Stanford's code of conduct, Defendants' letters do not imply any other, undisclosed facts. For example, Defendants do not purport to be eyewitnesses or to otherwise have any firsthand knowledge of the accident. (Cf. *Dickinson*, *supra*, 17 Cal.App.5th at p. 689 [letter claiming rape allegation was fabricated "was authored by [the alleged rapist's] attorney, who was speaking for [the alleged rapist], who, in turn, would certainly know whether or not he sexually assaulted [the alleged victim]"].) Although Defendants did not in every instance expressly state the challenged statements were their opinions or beliefs, they referred to news articles, police reports, witness statements, and/or the charges brought against Plaintiff; identified the recent date of the incident; and stated Plaintiff had been arrested, detained, and/or charged, but did not claim he had been found guilty. The letters make clear that the statements are based on the initial police investigation, as reflected in police reports, charges, and news articles.

We next turn to the context. "In considering the *context* of the statement, we look at facts including the audience to whom the statement was directed [citation], the forum in which the statement was made [citation], and the author of the statement." (*Dickinson*, *supra*, 17 Cal.App.5th at p. 686.) Defendants explicitly identified themselves as relatives of Decedents; openly expressed grief at their deaths; and clearly stated their desire that Stanford expel Plaintiff or take other action to hold him accountable. In this way, Defendants identified their roles as advocates with a specific agenda. Moreover, Defendants "did not purport to be . . . attorney[s].[9] The average

---

[9] Although Kathleen was an attorney, she did not so identify herself in the letters. Neither Priscilla nor Anthony were attorneys.

24

reader therefore would not have assumed the statements in the [letters] had the weight of a legal opinion." (*Franklin*, *supra*, 116 Cal.App.4th at p. 389.) As for the audience, Stanford is an institution of higher education that would not construe Defendants' letters—describing news articles, police reports, and charges for the then-recent accident—as stating that any of Plaintiff's alleged conduct had been proven true. Indeed, there is no evidence that Stanford took any action following receipt of Defendants' letters; the first communication to Plaintiff from Stanford about the accident appears to have been in December 2021, in a letter acknowledging the pending criminal allegations and noting Plaintiff's denial of wrongdoing.[10]

Plaintiff argues Defendants' letters were serious in tone and did not contain hyperbole or rhetoric. The contention is not material because there is no requirement that nonactionable opinions *also* be hyperbolic. (See *Franklin*, *supra*, 116 Cal.App.4th at p. 385 ["[S]atirical, hyperbolic, imaginative, or figurative statements are protected because 'the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact' "].) Similarly, that one of the challenged statements accused Plaintiff of murdering Decedents—a heinous crime—is not determinative. " 'Accusations of criminal activity, like other statements, are not actionable if the underlying facts are disclosed.' " (*Id.* at p. 388.)

Accordingly, considering both the language and the context of Defendants' letters, we find the assertions that Plaintiff murdered Decedents, drove while intoxicated, drove at excessive speeds, tried to flee, refused a breathalyzer test, and/or violated Stanford's code of conduct to be opinions

---

[10] Stanford's letters to Kathleen acknowledging receipt of her letters do not indicate or suggest that Stanford took any action based on the opinions expressed in the letters.

based on disclosed facts.  The opinions are therefore "actionable only if these facts are false." (*Integrated Healthcare, supra,* 140 Cal.App.4th at p. 529.)

Plaintiff argues these opinions are based on incorrect facts because Plaintiff did not murder Decedents, drive under the influence, drive at excessive speeds, try to flee, refuse a breathalyzer test, or violate Stanford's code of conduct.  But "[b]ecause we are not determining the truth or reasonableness of [Defendants'] opinions, the issue . . . is not whether the [police reports, news articles, and charging documents] made truthful assertions of fact, but whether the [police reports, news articles, and charging documents] in fact existed and made the assertions claimed." (*Franklin, supra,* 116 Cal.App.4th at p. 389.)  Plaintiff does not dispute that, at the time Defendants wrote their letters, police claimed Plaintiff killed Decedents while driving intoxicated and at excessive speeds, and refused a breathalyzer test at the scene; the news media so reported; and Plaintiff was charged with two counts of gross vehicular manslaughter while intoxicated.[11]

With respect to the statements that Plaintiff tried to flee the scene, the evidence shows that police said Plaintiff fought with officers at the scene and tried to take an officer's weapon; and Plaintiff was charged with resisting an executive officer, attempting to remove a firearm from a peace officer, and misdemeanor battery on a peace officer.  These facts reasonably support Defendants' statements that the initial police investigation indicated Plaintiff

---

[11] The disclosed facts did not support an opinion that Plaintiff was charged with or had committed murder as defined in Penal Code section 187, subdivision (a).  However, given the context of the letters, Stanford would have understood Defendants to be using the lay meaning of the term "murder"—an unlawful and unjustified killing—which was supported by the disclosed facts.  (See Merriam-Webster's Online Dict. (2025) <https://www.merriam-webster.com/dictionary/murder> [as of Feb. 25, 2025] [defining "murder" as "the crime of unlawfully and unjustifiably killing a person"].)

tried to flee the scene, and therefore this statement is also nonactionable opinion. (*Integrated Healthcare, supra,* 140 Cal.App.4th at p. 527 [" 'An opinion is actionable if it discloses all the statements of fact on which the opinion is based *and those statements are false*' " (italics added)].)

Accordingly, because the disclosed facts were true, Defendants' statements that Plaintiff murdered Decedents, drove under the influence, drove at excessive speeds, tried to flee, refused a breathalyzer test, and violated Stanford's code of conduct are nonactionable opinions.[12] We therefore conclude Plaintiff failed to establish a probability of prevailing on his defamation claim as to these statements. This resolves Plaintiff's entire defamation claim against Priscilla.

In contrast, the statement made by Anthony and Kathleen that Plaintiff had previously been charged with a DUI is not a nonactionable opinion because the record does not establish that any police report or news article so stated, or that Plaintiff was so charged. Kathleen's averment, with no corroborating evidence, that she believes she was told such information by an unidentified relative, who she believes learned it in turn from a law enforcement officer, is not sufficient.

---

[12] For the first time at oral argument, Plaintiff argued Defendants were liable for republishing defamatory statements made in the news articles and police reports. (See *Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 268 ["one who republishes a defamatory statement is deemed thereby to have adopted it and so may be held liable, together with the person who originated the statement, for resulting injury to the reputation of the defamation victim," subject to "privilege[s] in certain defined situations"].) " 'It is a clearly understood principle of appellate review, so well established as to need no citation to authority, that contentions raised for the first time at oral argument are disfavored and may be rejected solely on the ground of their untimeliness.' " (*Estate of McDaniel* (2008) 161 Cal.App.4th 458, 463.) We so reject Plaintiff's belated contention.

C.    *Negligence*

Defendants contend Plaintiff failed to establish a question of fact as to whether they acted negligently.  We consider this claim as to the remaining actionable statement—that Plaintiff had a prior DUI charge, made by Anthony and Kathleen—and reject it.

To establish his defamation claim, Plaintiff must prove that Anthony and Kathleen "failed to use reasonable care to determine the truth or falsity" of the challenged statements.  (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 990.)  "[W]hether the defendant acted reasonably under the circumstances . . . [is a] factual question[] for the jury to resolve unless, 'under undisputed facts, there is no room for a reasonable difference of opinion.' " (*Mayes v. La Sierra University* (2022) 73 Cal.App.5th 686, 705, fn. 2.)

Anthony averred generally, "The statements in the Email were based entirely on the news coverage I reviewed, the information relayed to me by [my] relatives from Officer Fuentes, and the allegations in the Criminal Complaint.  At that time, I had no contradictory information or any other reason to doubt any of that information."

Kathleen averred that during a June 2021 family meeting, "I remember there was a discussion of a prior DUI, but I cannot recall which law enforcement officer represented to a family member that Plaintiff . . . had a prior arrest of driving under the influence a few years ago . . . .  I cannot recall which agency the law enforcement officer was from who relayed this information as it was not relayed to me directly."

On this record, we cannot say there is no room for a reasonable difference of opinion as to whether Anthony and Kathleen acted reasonably under the circumstances.  They supplied no specifics about how they allegedly learned the information at issue, and cited no news articles, police

28

reports, witness statements, or other record evidence that Plaintiff had a prior DUI charge.

D.    *Damages*

Anthony argues Plaintiff failed to show he sustained damages.[13]  The claim fails.

"In an action for defamation per se, the meaning is so clear from the face of the statement that the damages can be presumed."  (*Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521, 542.)  "Statements constitute libel per se when 'a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter.' "  (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 686.)  The remaining actionable statement—that Plaintiff had a prior DUI charge—conveys a defamatory meaning without the need for any extrinsic knowledge.  Accordingly, this statement is defamatory per se and damages can be presumed.  (See Gaab & Reese, Cal. Practice Guide: Civil Procedure Before Trial, Claims and Defenses (The Rutter Group 2024) § 4:524 [with exceptions not relevant here, "in all cases of *defamation per se*, plaintiffs may recover 'presumed' (or 'assumed') damages—i.e., damages that are presumed to exist as a result of the defamation—*without proof of actual harm*," including "compensation for 'loss of reputation, shame, mortification and hurt feelings' "].)[14]

---

[13] Priscilla also asserted this argument; however, we have found all her statements to be nonactionable opinions.

[14] We need not decide whether, as Plaintiff contends, the trial court erred in failing to sustain an evidentiary objection asserted by Plaintiff against Priscilla as to evidence on which we have not relied.  We also need not decide evidentiary objections raised by Kathleen relating to issues we have decided in her favor.

DISPOSITION

In A169427, the order is reversed and remanded with directions to enter a new order granting Priscilla's anti-SLAPP motion. Priscilla shall recover her costs on appeal.

In A169948, the order is reversed and remanded with directions to enter a new order on Anthony's anti-SLAPP motion: (1) granting it as to the statements that Plaintiff murdered Decedents, drove under the influence, drove at a high rate of speed, and tried to flee the scene; and (2) denying it as to the statement that Plaintiff had previously been charged with a DUI. The parties shall bear their own costs on appeal.

In A169976, the order is reversed and remanded with directions to enter a new order on Kathleen's anti-SLAPP motion: (1) granting it as to the statements that Plaintiff murdered Decedents, drove under the influence, drove at a high rate of speed, tried to flee the scene, refused to take a breathalyzer test, and violated Stanford's code of conduct; and (2) denying it as to the statement that Plaintiff had previously been charged with a DUI. The parties shall bear their own costs on appeal.


SIMONS, J.


We concur.

JACKSON, P. J.
CHOU, J.


(A169427 / A169948 / A169976)

30